All right, the next case we'll hear Mauricio versus, Vasquez versus Jefferson, Sessions. We'll hear from Ms. Cohen first. Good morning, Your Honors. May it please the Court. My name is Madeline Cohen, and I represent the petitioner, Mr. Yerson Mauricio-Vasquez. Mr. Mauricio-Vasquez is a legal permanent resident who immigrated here from Peru as a child to join his family. The government seeks to deport Mr. Mauricio-Vasquez on the theory that he committed a crime involving moral turpitude within five years of his admission to the United States. To do so, the government was required to prove by clear and convincing evidence, first, that Mr. Mauricio-Vasquez was admitted to the United States no more than five years before the conduct underlying his conviction, and second, that abduction under Virginia code is indeed a crime involving moral turpitude. The Board of Immigration Appeals erred below in holding that the government met this burden. Turning first to Mr. Mauricio-Vasquez's date of admission, the Board erred because it misapplied its own precedent in finding that Mr. Mauricio-Vasquez's conviction occurred within five years of his admission to the United States. In matter of Quilantan, the Board held that an entry into the United States with procedural regularity is an admission under the INA. An individual enters with procedural regularity when he presents himself for inspection at a port of entry and is permitted to enter the United States. In Quilantan, the non-citizen there had applied for a visa to the United States, and it was denied, and several days later, she entered at the U.S.-Mexico border as a passenger in a car, despite the fact that she had no visa to enter. As she testified, the Border Patrol agent questioned the driver of the car, but did not question her, and waved the car through, and according to the Board, in its precedential decision, she was therefore admitted. Similarly, in Amoca v. Bucasey, the Second Circuit held that a non-citizen was admitted. They're not disputing this, are they? In other words, the principle of what constitutes admission, I don't think the government's challenging, is it? Your Honor, I'm not sure that the government — Yersin came in in 2002, in February 2002, and presented himself through normal procedures and was admitted, and because he was admitted then, it's beyond the five years. Yes, Your Honor. Okay. And that comes down to your argument that they could not rely on the earlier referred-to date of 2000, when his mother came in, even though it related to him, because there was substantial evidence that undermined any clear and convincing finding that he was still in Peru from 2000 to 2002, and you rely on the evidence you've presented in your brief. So it's really a question of whether the government presented clear and convincing evidence of the five-year condition, rather than what constitutes admission, right? Well, Your Honor, while we agree that part — I didn't know they disputed that, but you can go ahead. I don't want to interrupt your argument. Sure. No, we would agree that part of the issue is whether the government submitted clear and convincing evidence, and not necessarily arguing that the government disputes Quilantan or the fact that that standard would apply. The issue is rather that the IJ, in making his factual findings, found Mr. Mauricio Vasquez's testimony and his story of how he came over in 2002 on an airplane with his godmother through an international airport at eight years old credible. The IJ said in his opinion that he found that testimony credible, and yet his issue with the evidence put forth by Mr. Mauricio Vasquez was that he couldn't show the specific visa that he used, or what type of visa it was, or what travel documents he used. And when the board affirmed the IJ's decision, it said, Affidavits previously submitted on the respondent's behalf are insufficient to establish on which visa the respondent purportedly entered the United States through an airport in 2002. So both the IJ and the board — The argument is that he doesn't have to establish evidence or create doubt about a visa. He just has to demonstrate that he entered through a port, presented himself, and was admitted through a port of entry. Yes, Your Honor. And because the IJ found his story — The proof of a visa wasn't necessary for that definition of admission. Precisely, Your Honor. It's a legally irrelevant fact. So the IJ and the board both determined that he couldn't show that he came in with procedural regularity, or that the government met its burden just because he couldn't show the actual visa that he came over on. But that is a legally irrelevant fact. So as a matter of law, for the board to make a determination on his date of admission based on that fact is an error. Well, let me ask you about that, because in its brief, the government says, and I'm quoting, the board — contrary to what you're saying — the board did not require your client to produce his visa or other travel documents with which he allegedly entered the United States in 2002 in order to show that he entered with procedural regularity. Instead, they say that the board concluded that his testimony, the affidavits from the interested witnesses, and the records, medical and school records, were insufficient to show that he entered the United States with procedural regularity in 2002. What's wrong with that? Well, Your Honor, just reading the IJ's opinion and then the board's opinion, which agrees with the IJ's finding of facts, the IJ found Mr. Mauricio Vasquez's story of how he came in in 2002 credible and instead found that because he couldn't show the specific visa, then the government's evidence must have been stronger. So the board did affirm the IJ's finding, but the IJ found Mr. Mauricio Vasquez credible, and that credibility determination is subject to deference. And I don't believe anywhere in the board's opinion did they disagree that that story was not credible and did not disagree with the IJ. Didn't the IJ also impermissibly shift the burden of proof when he came up with this concept, well, you didn't rebut the government's evidence? Yes, Your Honor. We believe that the IJ did impermissibly flip the burden onto Mr. Mauricio Vasquez and require him to meet a heightened burden that rather than just showing when he came in, he was also required to show this specific visa that he used and the travel documents that he used. And the burden flipping is particularly clear when analyzed in light of the fact that the IJ initially determined that the government had not met its burden. The board remanded. It seems to me the stronger argument you have is not creating an issue about whether there was admissibility, but that the board's reliance on the 2000 entry is unsubstantiated, is not clear and convincing, because he was still in Peru on that time by pretty clear evidence. I mean, he was still in school. He had the broken arm. And, of course, they have the affidavits. And then you have his own description of what happened. And he came to us when he went to school in Virginia. You have that pretty well documented. And the fact that they relied on his Peru school records. So the question is if the government is relying on 2000 entry.  And then the question is, well, when did he come in? And there's no other evidence other than 2002. The secondary issue, which the government then has to say that in 2002 he was not admitted. Absolutely, Your Honor, because it would be his more recent. But after 2002 the government didn't present any evidence as to whether it was regular or irregular. That is correct, Your Honor, yes. That was the point I was getting to, is that after the government, or after the IJ initially determined that the government didn't meet its burden and the board remanded, on remand the only additional evidence the government presented was evidence that Mr. Mauricio Vasquez had applied for visas in 2000 and that those were denied, which the government actually already showed the first time around. Mr. Mauricio Vasquez submitted school records from Peru and from Virginia, showing that he was in elementary school in Peru through the end of 2001 and began school in Virginia in 2002. He showed hospital records showing that he was living in Trujillo in 2001 and was admitted to the hospital in the fall of 2001 for a broken elbow. And he also testified via videoconference in front of the IJ, subject to cross-examination by the government. And the IJ found his story credible. And despite all of that, on remand the IJ flipped its decision and suddenly determined that the government had met its burden. And the IJ and the board's analysis don't really fully grapple with either the inconsistency between finding his story of traveling to the United States in 2002 through an international airport credible or with the fact that the government's evidence doesn't show that he didn't come in in 2002. It simply shows that he was denied visas in 2000 and that he has his adjustment of status form in 2008, which has the date of 2000 on it as well. So the board accepted the IJ's findings, but didn't address the fact that the IJ both found Mr. Mauricio Vasquez's story credible and then also found that he didn't have an admission until his adjustment date in 2008. So if we agree with you, we don't have to reach this moral turpitude issue, do we? That is correct, Your Honor. Yes. And you have an uphill battle on that. It sounds to me abduction is pretty morally reprehensible, but we don't have to get to that if you're right on the five-year deal. That is true, Your Honor. But even if the court determines that the government's date of admission argument was correct, Mr. Mauricio Vasquez still is not removable because abduction under the Virginia Code is not a crime involving moral turpitude. A crime involving moral turpitude is one that's inherently base, vile, or depraved. And as this court has recently held, a crime involving moral turpitude must contain some intent to defraud or deceive. And if it does not, then it must contain some aggravating factor, such as an example this court has given is violence that rises to the level of moral depravity. Do you agree we have to look at this statute from a categorical approach? Yes, Your Honor. Under the categorical approach, the court would look at the Virginia abduction statute and compare the elements of that statute to this generic definition of a crime involving moral turpitude. And if you look at the Virginia statute, it does not meet these requirements. For example, in United States v. Siddiqi, a prosecution under the- What is the intent requirement under Virginia law? It is the intent to deprive someone of their liberty or to conceal them from someone who has legal custody of that person. You don't think that intent is a moral depravity? No, Your Honor, because the intent that's required under a crime involving moral turpitude isn't just the intent to commit the crime or the intent to- I understand. The intent has to be something that reveals a moral depravity. In other words, the intent is committing a violating law we've held in and of itself is not satisfying moral turpitude standard. It has to violate some independent moral norm. But if you sit there and design an intent to abduct somebody and deny them their freedom, it sounds to me like that does satisfy moral turpitude. Well, Your Honor, under this Court's precedent, there has to be an intent to defraud or deceive or there has to be some other aggravating elements, such as a level of violence that raises the level of moral reprehensibility. And there are cases under the Virginia abduction statute that simply don't rise to this level. If you violate the tax laws and tend to cheat the government, that intent doesn't satisfy your requirement, yet it involves moral turpitude? Well, Your Honor, the intent to deceive or defraud would count as a crime involving moral turpitude. But in, for example, United States v. Zdehegi, the defendant was driving two passengers home and he saw a police vehicle outside their house, got spooked, and refused to stop. He instead slowed the vehicle down and asked them to exit. They refused. And he instead drove another mile or two to a gas station away from the police car, stopped there, and let the passengers out. And he was convicted under the Virginia abduction statute because he did have the intent to deprive him, deprive his passengers of their liberty as he drove away from their home to the gas station. But he didn't have the intent to defraud or deceive them, and he didn't have the intent to harm them or commit any violence against them. He was simply afraid of the police officer and refused to let them out of the vehicle right at their house. This is the kind of case that is brought under this statute and doesn't rise to the level of a crime involving moral turpitude. So I lock somebody up in the basement of my house and don't let them out, intending to deprive them of their liberty? That's not immoral? Your Honor, it certainly could be, but the conduct that the court looks at is the minimum conduct that could be prosecuted under the statute. There certainly could be conduct that has been and will be prosecuted under this statute that would rise to the level of a crime involving moral turpitude. Either because of the intent or because of the conduct itself. But the minimum conduct that this statute prohibits does not rise to that level. In fact, there were two other cases I think you cited that involved one involved a bail bondsman who, in trying to secure his bailee, mistook the bailee for a deputy sheriff and was convicted under this statute. And then there are cases apparently where Virginia has convicted non-custodial parents of abducting their children. So those are those are the kinds of examples that you're talking about. This least minimal conduct, which seems to be apparent on his face, would not satisfy the statutory definition of morally reprehensible conduct. Is that right? Yes, Your Honor. So, for example, in Bennett v. Commonwealth, a non-custodial mother drove to the grandparents of her children's house and took the children out of their house against the grandparents' wishes. And she was found to have the intent to deprive the grandparents and the father of rightful legal custody of her children. But her intent was to have her children with her. And her conduct was picking her children up and taking them away with her. There was no fraud. There was no deceit. And there was certainly no violence against the children. And yet she was convicted of abducting her children under this statute. And similar statutes, like obstruction of justice under Utah law, that requires the use of force, intimidation, or deception to prevent someone from performing a law enforcement activity with the intent to prevent that activity. So to prevent apprehension, prosecution, conviction, or punishment. And the Tenth Circuit has held that that is not a crime involving moral turpitude because both the intent is not necessarily to defraud or deceive or to cause harm to the law enforcement officer who you're obstructing. We've held that the moral turpitude actually we've held actually under this statute only requires that it violate an independent moral norm. And the INA has said that moral turpitude is conduct contrary to the accepted rules of morality and duties owed between persons or to society in general. So that's much different. Both of those definitions focus more on the moral nature of the conduct and not the depravity you're talking about or the force of the injury or whatever. And I must say, if we're going to overrule the INA, it would require a lot of writing. Your Honor, I see my time is up. May I briefly respond? Sure. There are many different definitions of a CIMT because it is vague and it is not specifically defined in the INA. But this court, as recently as earlier this year in Ramirez v. Sessions, specifically stated that a CIMT involves some element of fraud or deceit. And if it does not, there must be some additional aggravating element that shocks the public conscience, such as violence that raises to the level of moral depravity. Okay. Thank you, Your Honors. All right. Ms. Conrad? May it please the Court. My name is Dawn Conrad and I'm here today on behalf of the U.S. Attorney General. Addressing first, as Petitioner's Counsel did, whether Petitioner committed the offense in September 2012, whether that was within five years of his admission to the United States, we believe the Board properly found that Petitioner committed the offense within five years of his adjustment of status, which was the admission by which he was then in the United States. The Board properly found that DHS established this charge with clear and convincing evidence. They produced evidence that he had two visa denials in the year 2000, as well as his 2006 adjustment application in which Petitioner swore. Those are the two things. But let's go back to the 2000 denials. That doesn't really prove anything other than if he came in 2000, he would have come in illegally at that time. Well, it shows, Your Honor, that he did have two visa applications that were denied. In 2000. In 2000, that's correct. Now, if it's established, I mean, that doesn't prove anything in your session as to when he was admitted. The only thing you have on when he was admitted is his later application. And yet he comes in and proves that he was not in the United States in 2000. He didn't come in at that time and that he actually came in in 2002. And if that's so, it seems to me that undermines your clear and convincing argument, which doesn't provide any direct evidence that he came in in 2000. Well, Your Honor, we do have his adjustment application in which he swears under penalty of perjury that he entered without inspection. And the government in this case did not have to prove exactly what year he entered. All that they had to show was that he did not enter with procedurally regularity before his 2008 adjustment of status. And the government did so because even if you take everything he says is true, he doesn't establish how he entered the United States because we don't know. I thought he testified he came in with a godmother. Right. He came in the airport. They went through customs or inspection, whatever it was. Well, just because he entered with this unidentified godmother, we don't know if he entered falsely claiming to be a U.S. citizen, which would not count as a procedural regular admission. The burden's on you. You keep pushing the burden on him. The burden's on you to show that when he came to the United States, he claims he came with, under the definition, presented himself at a port of entry and was admitted. And that's what he claims, and he puts in evidence that was found credible. Now, you have to prove by clear and convincing evidence this is phony. But you come with no evidence. As a matter of fact, all the corroborating evidence shows that his story holds true. We respectfully disagree, Your Honor, because we did have evidence, and that strong evidence was his adjustment application in which he adjusted status, claiming to be someone who entered without inspection. And actually he – In 2000, right? That's what he says and swears. That's important because in 2000 he was 8 years old, and the application is 13 years old. He's still a minor. Somebody's doing all this for him. He's told to sign, I guess, on the application. But we know that the 2000 is an error, don't we? We don't know that for sure. I mean, he didn't – Is there any evidence that he came in in 2000? Any? Besides his adjustment application? Besides that one statement, which is signed, is prepared by somebody else. And, of course, he doesn't have all these dates with him. Well, not in the record, Your Honor. It's credible that he broke his arm and ended up in a hospital in Peru. That was in August of 2001. He presented records that he went to school during the period 2000 to 2002 in Peru. And the school in Virginia relied on those records to place him between the third and the fourth grade in February 2002 when he entered the school. Yes. And then he has the affidavits of three people who said he was in Peru. And then you have his own testimony that he was there and how he got there and how he related. You have – you can't make clear and convincing evidence to say he entered in 2000. Well, we don't – we're not trying to establish that he entered in 2000. We're just trying to establish – You have to do it based on a statement in the application that he was denied visas in 2000 and, therefore, he wasn't admitted. Well, that statement was only to show that he previously applied for visas and those were denied such that if he had subsequently – That's irrelevant to anything, right? Well, if he had subsequently applied for visas and they were granted, we would obviously have records of that. Except who said he need a visa? Under your own doctrine, you don't need a visa. What you need is the presentment at a port of entry and admission through the normal process, not deception. And he presented that evidence. But my point is this reliance on the denied visas in 2000 is no more important than the denied visas in 1998 or 1996 and he applied every one of those times and was denied. It's just irrelevant. Well, Your Honor, we still think that even if all of his affidavits are taken as true, it doesn't necessarily establish a procedurally regular admission that satisfied – He said he needs to establish it. Because he's trying to rebut the government's evidence that he entered without inspection. You have the burden and the burden you relied on is that he came in 2000 because that's what he stated and we know that's not true. Now, that's the only thing we have. We have a statement by you, your evidence that he came in – A statement by him, Your Honor. Well, I know, but that's your evidence. You're presenting that he came in, he was admitted within five years. And that statement that you're relying on is demonstrably untrue because it relies on his admission in 2000. Well, Your Honor, it's also not just the date of his admission, but he also applies – he also states several times in that application that he entered without inspection. In 2000. Well, he states separate from when he entered. He's checked several boxes saying he entered without inspection. So we would say that that also – You have the burden of showing that he entered without inspection within five years or beyond five years. That's correct, Your Honor. Well, we have the burden of showing he did not have a admission prior to, I guess it would be 2007 in this case. Also, petitioner could have provided his mother to testify who might be able to provide more information. I'm sorry? His mother wasn't there. She didn't fly with him. She met him at the airport. But she could have identified this godmother that he claimed did travel with her, that he never provided even her name or any other information about this individual. Although the mother was not at the airport. Has anybody doubted this evidence? He testified how he went through an airport. This woman brought him through the inspection center. Has anybody questioned that? Has anybody questioned he traveled in 2002, that he flew on an airplane, went through the admission, that he entered school? I mean, all of this. Well, the agency did not find – the board and the IJ did not find that that evidence was sufficient to show that he had a procedurally regular admission. Well, there's a burden on him. He doesn't have to be sufficient. You have to prove, and that evidence only has to cast doubt, sufficient doubt so that you don't satisfy the clear and convincing. I think you haven't satisfied any standard under approving that he was admitted. That he entered without inspection. Within five years. Well, I mean, we obviously have his adjustment of status record, which shows that he adjusted status in 2008. So that would be an admission. And then we – That's it. That's it, right? Well, we have no other evidence that he entered via an airport. No evidence produced – I'm sorry. No evidence produced in the court in the process of normal government records. And the board and the IJ in this case – But aren't we supposed to have a hearing to have all the evidence collected and the board and the IJ both received evidence, and it's undisputed that he entered in 2002. And he entered through a port of entry, and he was inspected. And that's uncontroverted. Well, Your Honor, we don't agree that it could be a procedural regular admission because we don't know how he entered. No, but that's your burden. Well, that was petitioner's burden to rebut the government's evidence that he entered without inspection. And we contend that he did not meet that burden in this case. Are you saying he went through the airport? That the inspection officer, he spoke to the inspector? Actually, Your Honor, he did not identify the person. He said he went through a checkpoint, but he didn't clearly identify that as an immigration official. He went through the airport, and he went through a checkpoint. What, did he have two flights? That's what he testified, yes. So turning to the other issue in this case, whether Virginia Code 18.247 is a categorical CIMT, we believe it is a categorical CIMT because it requires both a culpable mental state and reprehensible conduct. In this case, it requires the reprehensible conduct as abduction by force, deception, or intimidation, and a culpable mental state, which is the intent to deprive a person of their personal liberty or to withhold or conceal them from their lawful custodian. Is that a standard that's an INA standard? I just read one that I thought was a little different. Yes, Your Honor. Well, I'm quoting the standard that requires both reprehensible conduct and a culpable mental state has been held by this court in several times, most recently in Ramirez v. Sessions. And I believe in that case, this court required that a crime has both a showing of intent and an aggravating element such as deception or the use of force. And in this case, Petitioner is trying to argue that there's a realistic probability that Virginia applies the statute to conduct that is not morally turpitudinous, and Petitioner cites two cases that we respectfully disagree do not show moral turpitude. One is United States v. Zadighi, which was an unpublished decision of this court, which was not even a conviction. It was a revocation of parole based on the finding by the district court that Petitioner had conduct amounting to abduction under Virginia law. This does not require the same level of proof as a conviction. And also in that case, the court found that the defendant committed abduction when he failed to stop his car to allow his passengers out. So he kept them in his car by force or intimidation as they could not leave without the risk of safety. And we would argue that that does satisfy the definition of moral turpitude. In Bennett v. Commonwealth, we had a mother who had no parental rights, and she did not have a reasonable belief that her children belonged to her, as that's what the jury found, and she forced her way into the grandparents' home and forcefully removed the children. So we do not believe that also. We believe that also shows moral turpitude, and the court in that case specifically noted that if she did have a legal justification or excuse, she would not have been convicted. Are there any further questions? All right, thank you. Thank you very much. Ms. Cohen. May it please the Court. Your Honors, as Judge Nehemiah pointed out, the government has the burden to prove Mr. Mauricio Vasquez's date of admission by clear and convincing evidence, and they even admitted that proving the date of admission was their burden before the IJ at the merits hearing. The government has not met this burden with their own evidence and has tried to put the burden on Mr. Mauricio Vasquez to show the specific affidavit he used, put forth live testimony from his mother and his godmother. I guess their argument is he clearly came from another country, and the way you come into this country is make a presentation, and it ends up creating a record. You come in through some kind of document. That he applied for his... made the application in, what, 2008, and at that point basically said he was denied visas in 2000 and not admitted pursuant to inspection, I guess. The question is, does that standing alone with no other evidence meet the burden? It does not, Your Honor. Standing alone, the government hasn't met their burden, let alone with all the evidence that Mr. Mauricio Vasquez put on. Address what the government put on. Sure, well, the government's evidence that he was denied two visas in 2000 is no different than in Quilantan, where the non-citizen was denied a visa several days before she came in, and then she came in without a visa, but because she came in through a border and was permitted to enter, she was admitted on that date. Isn't that application treated as an admission? In other words, when you apply for that privilege, that is the admission, isn't it? When you apply for a visa, Your Honor? No, not that. What did he apply for in 2000? An adjustment of status. Adjustment. Status. When he applies for that, wouldn't that be deemed an admission if that were granted? No, Your Honor. Under this court's precedent in Aremu, an adjustment of status is not an admission if the non-citizen has been previously admitted to the United States, and the court also left open... Let's say there's no evidence of previous, so the only evidence is that document. That would be an admission, wouldn't it? Not necessarily, Your Honor. So this court actually left open in Aremu the question of whether if there is absolutely no admission before the adjustment of status, whether the adjustment of status would constitute an admission. So even if the court were to find that there was no date of admission before 2008, that's an open legal question, and Mr. Mauricio Vasquez would request supplemental briefing on that issue as it was not... So you're saying that even that evidence doesn't meet the government's burden in this case of setting aside any question of prior admissions or otherwise? No, Your Honor. It does not. It simply shows that he was not granted a visa to enter the country in 2000 per DHS's records. I see I'm out of time. Thank you, Your Honors. Very much. We'll adjourn court for the day and then come down and greet counsel.
judges: Paul V. Niemeyer, Albert Diaz, Henry F. Floyd